**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT PENNSYLVANIA**

| | |
|---|---|
| JOHN RODRIGUEZ, JENNIFER WORTHINGTON, BOBBY CROUTHER, JESUS CONCHAS and ROSA MARIA CONCHAS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL CITY BANK, NATIONAL CITY CORP. and DOES 1-10, inclusive;<br><br>Defendants. | CASE NO.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs John Rodriguez, Jennifer Worthington, Bobby Crouther, Jesus Conchas and Rosa Maria Conchas ("Plaintiffs"), on behalf of themselves and a class of all others similarly situated, allege as follows:

**INTRODUCTION**

1.      Defendants National City Bank and National City Corp. (also collectively referred to as "National City" or the "Company") have demonstrated an established pattern and practice of racial discrimination in the financing of residential home purchases.  Through these actions, Defendants have violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, the Civil Rights Act, 42 U.S.C. §§ 1981, 1982 *et seq.* and common law.

2.    This is a proposed national class action brought by Plaintiffs on behalf of themselves and a class of all other similarly situated Minority (defined below) homeowners subjected to Defendants' discriminatory practices in obtaining their residential mortgage loans (hereinafter referred to as the "Class" or "Class Members").  Plaintiffs seek relief for themselves and all other members of the Class from the indefensible injustice resulting from Defendants' unlawful business practices.

3.    For purposes of this Complaint, "Minority" or "Minorities" refers to persons who are African-American or Black, as well as persons who are Hispanic or Latino.  Additionally, for the purposes of this Complaint, "mortgage" refers to any loan made for the purpose of purchasing, constructing, improving, repairing or maintaining a dwelling, or a loan secured by residential real estate.

4.    The mortgage lending industry has a long history of racial discrimination, offering Minorities products and terms that are drastically worse than those given to their similarly-situated Caucasian counterparts.  Recently, the Federal Reserve Board confirmed that African-Americans and other Minorities are still more likely to pay higher prices for mortgages than Caucasians.

5.    According to the Federal Reserve Board's Survey of Consumer Finances, a triennial survey of the balance sheet, pension, income, and other demographic characteristics of U.S. families, 47% of African-Americans and Latinos are homeowners, compared with 74% of Caucasians.

6.     National City was recently specifically examined by the Inner City Press in their study of 2007 Home Mortgage Disclosure Act ("HMDA") data[1] and the existence of sub-prime racial disparities. According to the Inner City Press, in 2007, National City confined African-Americans to higher-cost loans about the rate spread 1.77 times more frequently than Caucasians and confined Latinos to higher-cost loans 1.73 times more frequently.  Fully, 25,012 of National City's 246,138 mortgages in 2007, or 10.16% were high cost loans over the rate spread[2].

7.     Further, in a recent study of the nation's top residential mortgage lenders—specifically including National City—released on September 5, 2007, the Association of Community Organizations for Reform Now ("ACORN"), one of the nation's largest community organizations of low- and moderate-income families, found that, nationally, African-American home purchasers were **2.7 times more likely** and Latinos were **2.3 times more likely** than Caucasian borrowers to be issued a problematic, subprime loan.  Additionally, the ACORN study, available at www.acorn.org, found that nationally, for refinance loans, African-Americans were **1.8 times more likely** and Latinos were **1.4 times more likely** than Caucasian borrowers to be issued a problematic, subprime loan.

8.     Differences in economic status are not to blame.  These racial disparities were found to persist even among borrowers of the same income level.  The ACORN study found that, among upper-income home purchasers (defined as persons with incomes 120% or greater than the area median income for their metropolitan area), African-Americans  were **3.3 times more likely** and Latinos were **3 times more likely** than similarly-situated Caucasians to be

---

[1] *See* "Subprime Racial Disparities Grew Worse in 2007 at JPMorgan Chase, Bank of America, Citigroup, WaMu, Other Large Banks and Countrywide, "Time to Stop the Bail-outs," says Inner City Press." Available at http://www.innercitypress.org/2007hmda1.html

[2] In 2007, the federally defined rate spread was 3 percent over the yield on Treasury securities of comparable duration on first lien loans, 5 percent on subordinate liens.

issued a high-cost, subprime loan.   Further, the ACORN study found that, with respect to refinance loans, among upper-income borrowers, African-Americans and Latinos were **1.7 times more likely** than similarly-situated Caucasians to be issued a high-cost, subprime loan.

9.      In the ACORN Study, National City was listed as one of the 19 largest lenders that the institute examined to compile their data about mortgage discrimination. National City was mentioned in a group of lenders that represents 68.49% of all residential mortgages originated in 2006 and 50.47% of the subprime market.

10.     In 2003, the National Community Reinvestment Coalition ("NCRC") released a report on credit discrimination titled, "The Broken System:  Discrimination and Unequal Access to Affordable Loans by Race and Age,"[3] that indicated that consumers living in areas with more Minority residents are more likely to have mortgages with interest rates higher than the "prevailing and competitive" rates, often because of discrimination in lending.

11.     Home Mortgage Disclosure Act ("HMDA") Data for 2006 revealed that African-American and Latino borrowers are more likely to obtain higher priced loans than are Caucasian borrowers.[4]   The data indicated that African-American homeowners who received sub-prime mortgage loans were much more likely to be issued a higher-rate loan than Caucasian borrowers with the same qualifications.

12.     In a study conducted by the NCRC in 2006[5], National City was specifically named as one of the top lenders examined in a study of Fair Lending Disparities during 2005. The data showed that in the year 2005, African-Americans received 16.8% of the conventional

---

[3] This report is available at http://ncrc.org/policy/cra/documents/ncrcdiscrimstudy.pdf/.

[4] This report is available at www.ffiec.gov./hmda/.

[5] See "The 2005 Fair Lending Disparities: Stubborn and Persistent II," May 2006. Available, http://www.ncrc.org

high-cost loans but only 5.5% of the conventional market-rate loans.   In contrast, Caucasians received a greater percentage of prime than high-cost loans.   Caucasians received 51.8% and 67.4 percent of the high-cost and market-rate loans, respectively.   In addition, of all the conventional loans issued to Hispanics, 40.7% were high-cost.   Minorities received a disproportionately small percentage of market-rate loans and a disproportionately large percentage of high-cost loans.

13.   In a speech last year, Martin J. Gruenberg, Vice Chairman of the Federal Deposit Insurance Corporation discussed that "previous studies have suggested higher-priced, subprime lenders are more active in lower income, urban areas and that minority access to credit is dominated by higher cost lenders."[6]

14.   Findings in a study released by the NCRC in July 2007[7] confirm that institutions in at least six urban areas engaged in "pervasive discriminatory and predatory practices."   Such practices include offering high cost sub-prime loans to higher-qualified African-Americans 54% of the time, compared to 23% of the time for Caucasians, even when Caucasian applicants were similarly or less qualified.

15.   Sub-prime loans to African-Americans and other Minorities not only impose higher interest rates, they are typically laden with excessive, unreasonable and often improperly disclosed fees as well.   Such fees include high prepayment penalties which make it impossible for borrowers to later refinance at a competitive and fairer rate.   The Center for Responsible Lending estimates that families lose $2.3 billion each year from their home equity wealth because of prepayment penalties in sub-prime mortgage loans—representing a transfer of wealth

---

[6] *See* "Remarks of Martin J. Gruenberg, Vice Chairman, FDIC; Inter-American Development Bank", October 18, 2006, available at Http://www.fdic.gov/new/speeches/archives/2006/chairman/spoct1806.html.

[7] "Income is no Shield Against Racial Differences in Lending," available at  http://ncrc.org.

from working families to large, institutional lenders. African-Americans are more than three times as likely as Caucasians to be put into one of these equity-draining sub-prime loans. (*See* n. 3).

16.     The patterns of lending discrimination were recently examined in a study conducted by the California Reinvestment Coalition, Community Reinvestment Association of North Carolina, Empire Justice Center, Massachusetts Affordable Housing Alliance, Neighborhood Economic Development Advocacy Project, and the Woodstock Institute in March of 2007 ("2007 Joint Report").[8] The study discussed higher cost home purchase lending in six metropolitan areas (Boston, Charlotte, Chicago, Los Angeles, New York City and Rochester) during 2005 and found significant disparities between loans made to Minority and Caucasian borrowers.

17.     The Joint Report noted that in all six metropolitan areas examined, African American borrowers were 3.8 times more likely to receive a higher-cost home purchase loan than were Caucasian borrowers. Latino borrowers were 3.6 times more likely than Caucasian borrowers to receive a higher-cost home purchase loan.

18.     The Federal Reserve has also noted that borrowers of color are more likely to obtain their loans from higher-cost subprime lenders.

19.     These significant disparities are not mere coincidences. They are the result of a systematic and predatory policy of targeting Minority borrowers for high cost loans. Defendants' business practices include implementing and maintaining policies that discriminate against Minorities. Plaintiffs bring this lawsuit to seek relief from the harms suffered as a result

---

[8] *See* "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending," available at www.woodstockinst.org.

of Defendants' practices and to enjoin Defendants from continuing their discriminatory practices.

**THE PARTIES**

**Plaintiffs**

John Rodriguez and Jennifer Worthington

20. Plaintiff John Rodriguez and Jennifer Worthington, co-borrowers, have been harmed by Defendants' unlawful conduct.

21. Plaintiffs John Rodriguez and Jennifer Worthington, residents of Coatesville, Pennsylvania, are Minority homeowners. On or about December 1, 2006, Plaintiffs Rodriquez and Worthington obtained a mortgage loan from National City, secured by their residence located at 1113 Olive Street, Coatesville, Pennsylvania. Their lender was listed as "National City Mortgage, a division of National City Bank."

22. National City knew that Plaintiffs Rodriquez and Worthington were Minorities.

23. Prior to closing, the National City loan officer with whom Plaintiffs Rodriquez and Worthington dealt instructed them to bring a $305 application fee to his home, then charged them an additional application fee at closing.

24. At closing, Plaintiffs Rodriquez and Worthington were placed into a high cost loan with excessive fees. They were placed into an ARM with an initial rate of 9.375%, *after* being charged a loan discount fee of $3,078.25. National City also charged Plaintiffs Rodriquez and Worthington a loan origination fee of $1,759.00, an underwriting fee of $395.00 and a commitment fee of $350.

25. The National City loan officer did not attend the closing. At closing, a representative of the *seller* noted that National City was charging Plaintiffs Rodriquez and

Worthington excessive discretionary loan charges and engaged the National City loan officer by phone, in an attempt to obtain more reasonable, fair terms for them—without success.

26.     Plaintiffs Rodriquez and Worthington are now trapped in a high cost loan. Despite clear language in their Adjustable Rate Note that provided for an unfettered right to prepay the loan in full or in part, without penalty, Plaintiffs Rodriquez and Worthington were instructed to sign a "Prepayment Penalty Addendum" that burdened them with a prepayment penalty, which restricts their ability to refinance.

27.     Further, the prepayment penalty applies during the first *three* years of their loan, while their ARM is pegged to reset after the first *two* years of their loan.   Thus, Plaintiffs Rodriquez and Worthington are restricted from refinancing their loan prior to the date on which their ARM resets.

28.     A similarly-situated non-Minority borrower would have received a loan from National City on more favorable terms than Plaintiffs Rodriquez and Worthington received.

Bobby Crouther

29.   Plaintiff Bobby Crouther ("Crouther") has been harmed by Defendants' unlawful conduct.

30.     Plaintiff Crouther, a resident of Plainfield, Illinois, is a Minority homeowner.  On or about May 24, 2006, Plaintiff Crouther obtained a mortgage loan from National City, secured by his residence located at 7011 Bitterroot Drive, Plainfield, Illinois.  His lender was listed as "National City Mortgage, a division of National City Bank of Indiana."[9]

31.     At the time of his loan, Plaintiff Crouther was gainfully employed with good credit and income.  Further, National City knew that he was a Minority.

---

[9] National City Bank of Indiana was a subsidiary of National City Corp. and has since been merged into Defendant National City Bank. *See* National City Corp. 2007 Form 10-K Submission to the SEC, filed February 13, 2008.

32.     Despite the fact that he was qualified to receive a more favorable loan, Plaintiff Crouther was placed into a high cost ARM with an initial rate of 9.125%. A similarly-situated non-Minority borrower would have received a loan from National City on more favorable terms than Plaintiff Crouther received.

Jesus Conchas and Rosa Maria Conchas

33.     Plaintiffs Jesus and Rosa Maria Conchas, husband and wife, have been harmed by Defendants' unlawful conduct.

34.     Mr. and Mrs. Conchas, residents of Rockford, Illinois, are Minority homeowners. On or about January 6, 2007, Mr. and Mrs. Conchas obtained a mortgage loan from National City, secured by their residence located at 508 N. Avon Street, Rockford, Illinois. Their lender was listed as "National City Mortgage, a division of National City Bank."

35.     At the time of their loan, Mr. and Mrs. Conchas were gainfully employed, with good credit and income. Further, National City knew that they were Minorities.

36.     Prior to closing, on or about November 28, 2006, Mr. and Mrs. Conchas were provided with a Good Faith Estimate indicating a rate of 8.500%, and then later provided with a Good Faith Estimate indicating a higher rate.

37.     Despite the fact that they were qualified to receive a more favorable loan, Mr. and Mrs. Conchas were placed into a high cost ARM with an initial rate of 9.875%.

38.     A similarly-situated non-Minority borrower would have received a loan from National City on more favorable terms than Mr. and Mrs. Conchas received.

**Defendants**

39.     Defendant National City Bank is a national bank headquartered in Cleveland, Ohio.

9

40.   Defendant National City Corp. is a Delaware corporation, headquartered in Cleveland, Ohio.

41.   National City is one of the largest mortgage loan originators in the United States, primarily through its "National City Mortgage" division.   Upon information and belief, "National City Mortgage" is a division of National City Bank.   *See http://www.nationalcitymortgage.com/aboutus.asp,* accessed May 1, 2008.

42.   Upon information and belief, National City Mortgage Co., a subsidiary of National City Bank, is the Company's mortgage loan servicing unit, with a servicing portfolio of almost $170 billion. *See id.* Though National City Mortgage Co. is currently a non-party to this action, Plaintiffs reserve the right to assert claims against National City Mortgage Co.

43.   As the parent company of National City's residential mortgage-lending operations, National City Corp. directed, participated in and/or influenced the setting and establishing of credit-related policies and underwriting guidelines and practices used by each of the other Defendants.

44.   Further, each of Defendants directed, participated in and/or influenced the setting and establishing of credit-related policies and underwriting guidelines and practices used by each of the other Defendants.

45.   Each of Defendants had a duty not to discriminate on the basis of race and/or ethnicity and to ensure that their mortgage financing structure and policies did not have a disparate impact on legally protected minority groups.

46.   Plaintiffs are unaware of the names and capacities of those defendants sued as DOES 1 through 10, but will seek leave to amend this complaint once their identities become known to Plaintiffs.  Upon information and belief, Plaintiff allege that at all relevant times each

of defendants, including the DOE defendants 1 through 10, was the officer, director, employee, agent, representative, alter ego, or co-conspirator of each of the other defendants, and in engaging in the conduct alleged herein, which was in the course and scope of and in furtherance of such relationship.  Unless otherwise specified, Plaintiffs will refer to all defendants, including the Company, collectively as "Defendants" and each allegation pertains to each Defendants.

## JURISDICTION AND VENUE

47.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343. This is an action for violation of the Fair Housing Act, 42 U.S.C. §3601 *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, and the Civil Rights Act, 42 U.S.C. § 1981 *et seq.*

48.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendants reside in this district, within the meaning of 28 U.S.C. § 1391(c), a substantial part of the events or omissions giving rise to one or more of Plaintiffs' claims occurred, and/or a substantial part of property that is the subject of this action is situated, in this district.

## CLASS ACTION ALLEGATIONS

49.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and/or 23(b)(3) on behalf of the following (the "Class"):

> All Minority persons in the United States who obtained a residential mortgage loan from National City, inclusive of all National City affiliates and/or subsidiaries, and were harmed by Defendants' racially discriminatory policies and/or practices.

50.     The Class is so numerous that joinder of all members is impracticable.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

52.     Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and the Class were harmed by the same course of conduct and seek recovery under the same legal theories.

53.     There are questions of law and fact common to the Class, including but not limited to:

a)      Whether Defendants have a policy or practice of discriminating against Class Members by charging them higher interest, fees and other costs for home mortgage loans than it charges to Caucasians with similar credit scores or creditworthiness;

b)      Whether Defendants have policies or practices that have had a disparate impact upon Minority borrowers

c)      Whether Defendants' policies and practices have caused damage and injury to Plaintiffs and the Class entitling them to injunctive and declaratory relief, and the measure of that relief;

d)      Whether Defendants can articulate a legitimate non-discriminatory reason for their practices and procedures which are discriminatory;

e)      Whether Defendants have any business justification for its practices and procedures that cause a disparate impact upon Minorities;

f)      Whether there is a less discriminatory alternative to these practices;

g)      Whether Plaintiffs and the Class Members have sustained damages, and, if so, the proper measure of those damages.

54.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class Members.

55.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in complex nationwide class action litigation. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

56.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants.

57.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

58.     Class action status is also warranted under Rule 23(b)(2) because Defendants has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

59.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the Class Members predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUDULENT CONCEALMENT/EQUITABLE TOLLING

60.     Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule. In this case, it would be inequitable to permit the applicable statutes of limitation to bar the claims of any absent Class Member.

61.     First, Defendants knowingly and actively concealed the basis for the Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing. Not only did Defendants fail to disclose their discriminatory practices/policies and procedures that had a disparate impact upon Minority borrowers, but they took affirmative steps to conceal them.

62.     As one of the largest mortgage lenders in the United States, National City knew or should have known that its policies and procedures, including, without limitation, its credit

13

pricing system and the manner in which they train and incentivize their employees/agents causes Minorities to pay higher amounts for mortgage financing than similarly-situated Caucasian customers.

63.     Defendants affirmatively and intentionally concealed their discriminatory practices.  The Company's advertising materials were designed to create and foster the image that Defendants offer all qualified borrowers—regardless of race—competitive, low-cost residential mortgage loans, the pricing of which is objectively set.  Upon information and belief, Defendants also affirmatively concealed disproportionately high loan costs and fees, such as interest rate increases, add-on fees and unjustified interest rate hikes.  Defendants never disclosed and affirmatively concealed the truth concerning the fact that: (a) their credit rates and fees are subjective and can vary significantly among persons with substantially similar or identical credit profiles, and (b) they have authorized and provided a financial incentive to their loan officers and mortgage brokers to subjectively increase the credit rate above the rate otherwise available to homeowners, as well as increase other finance charges.

64.     Second, any delay by the Class Members is clearly excusable.  In addition to the reasons stated above, as a practical matter, victims of lending discrimination may not even realize that they received disparate terms until—if ever—years after the loan closes.  Here, the Class Members could not, despite the exercise of due diligence, have discovered the underlying basis for their claims.  For these reasons, any delay by the Class Members whose claims accrued outside of any applicable statutes of limitation was excusable.  Thus, to the extent that any applicable statute of limitations would bar the claim of any absent Class Members, such statute should be equitably tolled.

65.     As articulated in a recent study released by the Center for Responsible Lending[10] ("CRL 2008 Report"), a lack of transparency and the complexity of the loans in the subprime market make it all but impossible for consumers to know if they are being overcharged. The study finds that the complexity of mortgage pricing hampers both borrower's' ability to assess risk and to comparison shop. Such difficulties, they say, "are exacerbated by aggressive and sometimes deceptive marketing practices that further hinder borrowers from making choices that are in their best interest."

66.     Accordingly, Plaintiffs respectfully submit that it would be inequitable to permit the applicable limitation periods to preclude the claim of any member of the proposed Class, as doing so would, essentially reward Defendants for concealing their unlawful conduct.

## FACTUAL ALLEGATIONS

67.     National City is one of the top ten mortgage originators in the nation.   The Company operates through an extensive distribution network in Ohio, Florida, Illinois, Indiana, Kentucky, Michigan, Missouri, Pennsylvania, and Wisconsin, and also conducts selected lending and other financial services businesses on a nationwide basis.   National City's operations are primarily conducted through more than 1,400 branch banking offices.   In addition, National City operates over 410 retail mortgage offices throughout the United States.   *See* National City Corp. 2007 Form 10-K Submission to SEC, filed February 13, 2008.

68.   The Company's "National City Mortgage" division (a division of National City Bank) has 350 mortgage offices in 37 states and, additionally, services the remaining continental United States through its direct-to-consumer telephone and Internet lending centers in

---

[10] *See* "Steered Wrong: Brokers, Borrowers, and Subprime Loans." April 8, 2008. Available: http://www.responsiblelending.org/

15

Miamisburg, Ohio; Santa Rosa, California; Grandview and Kalamazoo, MI.    *See*
*http://www.nationalcitymortgage.com/aboutus.asp,* accessed May 1, 2008.

69.    During the Class Period, in addition to originating mortgages through its retail
channels, National City originated mortgages through wholesale channels, including a national
network of mortgage brokers.    On January 2, 2008, the Company announced the termination of
wholesale mortgage lending operations, but confirmed that it would continue to originate loans
nationwide    through    its    retail    channels.    *See*    *http://phx.corporate-*
*ir.net/phoenix.zhtml?c=64242&p=irol-news.*

70.    Also during the Class Period, National City originated sub-prime mortgage loans
through its subsidiary First Franklin Financial Corp. ("First Franklin").    On January 2, 2007,
National City announced that it had completed the sale of First Franklin to Merrill Lynch & Co.
on December 30, 2006.    Accordingly, the Class includes Minorities who received loans from
National City through First Franklin prior to such date.

71.    Owning a home is fundamental for one's economic security and the chief means
by which families build wealth.    Home equity accounts for more than one-third of the average
net wealth of U.S. households.    Studies demonstrate that this percentage is even greater for
Minorities.

72.    During the last decade, Minorities have been purchasing record numbers of
homes, leading to a multi-year housing boom.    They account for 49% of the increase in home
ownership from 1995 to 2005, according to Harvard University's Joint Center for Housing
Studies.[11]    Nonetheless, Minority home ownership is marred by sub-prime loans, excess fees and
higher costs than their Caucasian counterparts.

---

[11] Available at www.jchs.harvard.edu/son/index.htm.

73.     Sub-prime loans are higher-cost mortgage products that are in theory given to borrowers who are undesirable loan candidates.  In the last decade, an entire sub-prime industry has grown out of the greater profits generated by the higher rates and exorbitant fees charged to these "high-risk" borrowers.  This industry has inappropriately and unlawfully maximized its profits by directing borrowers with relatively good credit to sub-prime mortgages, especially Minority borrowers.

74.     As above-noted, in a recent study of the nation's top residential mortgage lenders-specifically including National City- released on September 5, 2007, the Association of Community Organizations for Reform Now ("ACORN"), one of the nation's largest community organizations of low- and moderate-income families, found that, nationally, African-American home purchasers were **2.7 times more likely** and Latinos were **2.3 times more likely** than Caucasian borrowers to be issued a problematic, subprime loan.  Additionally, the ACORN study, available at www.acorn.org, found that nationally, for refinance loans, African-Americans were **1.8 times more likely** and Latinos were **1.4 times more likely** than Caucasian borrowers to be issued a problematic, subprime loan.

75.     Further, as above-noted, National City was recently specifically examined by the Inner City Press in their study of 2007 Home Mortgage Disclosure Act ("HMDA") data and the existence of sub-prime racial disparities. According to the Inner City Press, in 2007, National City confined African-Americans to higher-cost loans about the rate spread 1.77 times more frequently than Caucasians and confined Latinos to higher-cost loans 1.73 times more frequently.  Fully, 25,012 of National City's 246,138 mortgage in 2007, or 10.16% were high cost loans over the rate spread.

17

76.    In a recent report released by United for a Fair Economy[12], the organization estimates that the total loss of wealth for people of color to be between $164 billion and $213 billion for subprime loans taken during the past eight years. The group believes that this represents the greatest loss of wealth for people of color in modern U.S. history. If subprime loans had been distributed equally, the report notes, losses for Caucasians would be 44.5% higher and losses for people of color would be about 24% lower. This is evidence of systemic prejudice and institutional racism.

77.    While some borrowers in the sub-prime market are genuine credit risks, Minority borrowers have been preyed upon by mortgage lenders and illegally steered into sub-prime loans.    Defendants have engaged in this predatory lending by refusing to offer Minority borrowers the prime loans offered to similarly-qualified Caucasian borrowers.

78.    Studies by Freddie Mac and Standard & Poor's have found that 20% to 30% of borrowers who receive sub-prime mortgages could have qualified for traditional mortgages at the lower rates offered by banks to prime borrowers.  This seriously disadvantages the borrower by effectively diluting the equity of the property, placing the borrower in jeopardy of default, and forcing the borrower to spend years paying off additional loan balances without developing any equity in their home.

79.    Further, the U.S. Department of Housing and Urban Development found that in neighborhoods where at least 80 percent of the population is African-American, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a sub-prime lender.

---

[12] *See* "Foreclosed: State of the Dream, 2008," January 16, 2008, United for a Fair Economy, available at www.faireconomy.org.

Higher-income borrowers living in predominately African-American neighborhoods are twice as likely as lower-income Caucasian borrowers to have sub-prime loans.[13]

80.     The predatory lending practices of the Defendants and other mortgage lenders lead to dire financial consequences for borrowers. Earlier this year, over eighty consumer groups wrote to federal banking agencies about a particular type of sub-prime loan, the adjustable rate mortgage (ARM). An ARM typically contains an average built-in "shock payment" increase of 29%, even if interest rates remain unchanged. Fitch Ratings reports that the actual payment shock may be as high as 48%. The majority of sub-prime loans made to Minorities had these adjustable rates. The Center for Responsible Lending estimates that 2.2 million such sub-prime loans have ended or will end in foreclosure, a rate of 19%.

81.     The Center for Responsible Lending published a study in December 2006 on the effects of foreclosure.[14]  The report states that the costs of sub-prime foreclosures fall heavily on African-American and Latino homeowners, since sub-prime mortgages are disproportionately made in communities of color. HMDA data shows that over half of loans to African- American borrowers are higher-cost loans, which, by definition, are a proxy for sub-prime loans. For Latino homeowners, the portion of higher-cost loans is also very high, at four in ten. This data implies that sub-prime foreclosures will affect eight percent of recent Latino borrowers and 10 percent of recent African-American borrowers. By comparison, sub-prime foreclosures will likely occur among only about four percent of recent Caucasian borrowers.

---

[13] *See* "All Other Things Being Equal:  A Paired Testing Study of Mortgage Lending Institutions," 2002, available at www.huduser.org.

[14] *See* "Losing Ground: Foreclosures in the Subprime Market and Their Cost to Homeowners." December 2006, available at www.responsiblelending.org.

82.     The Center for Responsible Lending released an additional study in November, 2007[15] that explains how when a home goes into foreclosure the negative effects extend beyond individual families losing their homes to surrounding neighbors and the wider community. The 2007 study reports that a foreclosure on a home lowered the price of other nearby single-family homes, on average, by .9 percent. That impact was even higher in lower-income neighborhoods, where each foreclosure dropped home values by an average of 1.44 percent. The study notes that communities of color will be especially harmed, since these communities receive a disproportionate share of sub-prime home loans.

83.     The 2007 study projects that, nationally, foreclosures on subprime home loans originated in 2005 and 2006 will have numerous impacts on the neighborhoods and communities in which they occur. For instance, the study predicts that 44.5 million neighboring homes will experience devaluation because of subprime foreclosures that take place nearby and the total decline in house values and tax base from nearby foreclosure will be about $223 billion. Homeowners living near foreclosed properties will see their property values decrease $5,000 on average. (*see* n. 9)

84.     The same seven state and regional research organizations that released the 2007 Joint Report (*see* n. 6) released an updated version of their 2007 "American Dream" Study in March, 2008 ("2008 Joint Report").[16] The collaborative report, which the organizations say they wish to make annual, focuses on examining the geographic lending patterns of a set of now defunct subprime lenders whose loans largely fueled the foreclosure wave that is currently devastating communities across the country. The 2008 Joint Report notes that according to the

---

[15] *See* "Subprime Spillover: Foreclosures Cost Neighbors $223 Billion; 44.5 Million Homes Lost $5,000 on Average." Center for Responsible Lending, available at www.responsiblelending.org.

[16] *See* "Paying More for the American Dream: The Subprime Shakeout and Its Impact on Lower-Income and Minority Communities," available at www.woodstockinst.org.

most recent data available, almost 1.3 million properties, or one for every 97 households, in the U.S. in 2007 had some type of foreclosure action taken against them. It is estimated that 2.2 million homeowners with subprime loans will lose their homes through foreclosure, resulting in a loss of $164 billion in wealth to these households, mainly in lost equity.

85.     In a 2005 working paper by Stephen L. Ross of the University of Connecticut, he comments that "abusive features in predatory loans, such as high income ratios and repeated refinancing of the same mortgage, is likely to exacerbate foreclosure rates in minority and low-income neighborhoods where sub-prime lending tends to be concentrated."[17]

86.     During the Class Period, National City originated and funded mortgage loans through both retail operations and wholesale operations, via a network of mortgage brokers.

87.     On information and belief, the loan officers and mortgage brokers that worked with National City brokered and funded loans in collaboration with Defendants' and in conformance with Defendants' credit-pricing policies and procedures.

88.     Defendants have followed -- and continue to follow -- discretionary loan pricing procedures that cause minority borrowers to pay subjective fees and other mortgage related finance charges at higher rates than similarly situated non-minority borrowers. Defendants have intentionally discriminated against Plaintiff and Class Members through these policies and procedures -- systematically giving them mortgage loans with less favorable conditions than were given to similarly situated non-minority borrowers. This pattern of discrimination is not the result of random or non-discriminatory factors. Rather, it is a direct result of Defendants' mortgage lending policies and procedures.

---

[17] *See* "The Continuing Practice and Impact of Discrimination." University of Connecticut. June, 2005, available at http://repec.org/.

89.  For example, on information and belief, Defendants' authorized loan officers and mortgage brokers received part of all of their compensation from Defendants based on the interest rate charged to the borrower.  Defendants' in-house loan officers and authorized brokers received more compensation from Defendants when they steered their clients into National City loans with higher interest rates and fees, and less compensation when they place their clients into National City loans with lower interest rates and fees.

90.  Defendants' conduct intentionally and actively implements this discriminatory credit-pricing policy in a number of ways, including actively educating its loan officers and brokers about Defendants' credit policies and procedures, and directing its loan officers and brokers regarding the marketing of Defendants' loan products.

91.  These credit-pricing policies and procedures permit Defendants' authorized loan officers and mortgage brokers subjectively to charge certain loan applicants higher fees at closing, higher interest rates, yield spread premiums and other discretionary charges, including Minority loan applicants.

92.  This pattern of discrimination cannot be justified by business necessity, and could be avoided through the use of alternative policies and procedures that have less discriminatory impact and no less business efficacy.

93.  In addition to discriminating through their own loan officers, during the Class Period, Defendants discriminated through their authorized mortgage brokers.  Authorized mortgage brokers acted as Defendants' agents in originating mortgage loans.  Authorized mortgage brokers entered into agreements with Defendants to accept loan applications on behalf of Defendants; communicate to loan applicants financing terms and rates set by Defendants; tell loan applicants about Defendants' various financing options; and ultimately originate mortgage

22

loans funded by Defendants using Defendants' forms and in accordance with Defendants' policies and procedures.

94.   Harvard University's Joint Center for Housing Studies found that a higher share of broker-originated loans go to African American borrowers (64 percent) than to Caucasian borrowers (38 percent).[18]   A large share of borrowers with these broker-originated loans count on lenders or brokers to find the best mortgage, however these borrowers are more likely to pay points (25 percent compared with 15 percent for lender-originated loans) and more likely to have a loan with a prepayment penalty (26 percent, compared with 12 percent for lender-originated loans.) According to the study, these findings imply that some brokers actively work to identify borrowers who lack the experience to correctly evaluate mortgage terms and prices.

95.   In addition to brokers, Defendants' authorized correspondent lenders and loan officers also acted as Defendants' agents in originating loans.   Correspondent mortgage lenders and loan officers that worked with Defendants made loans in accordance with Defendants' credit policies and procedures.   Defendants funded correspondent-generated loans before or shortly after they go to closing.

96.   National City, then, funded loans originated by its in-house loan officers, authorized mortgage brokers and correspondent lenders, set the terms and conditions of credit on those loans, and shouldered part of all of the risk on such loans.

97.   National City actively and intentionally enforced its credit policies in a variety of ways.   Among other things, Defendants supplied their loan officers, correspondent lenders and mortgage brokers with an array of loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts.   And, as

---

[18] *See* "The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending." December 2005. W05-11. Available: http://www.jchs.harvard.edu/publications/finance/w05-11.pdf

previously noted, Defendants actively trained their authorized brokers to follow Defendants' policies and procedures, and reinforce that training with marketing support.

98.   Once a loan applicant has provided credit information to Defendants through a loan officer, mortgage broker or correspondent lender, Defendants performs an initial objective credit analysis.   At that point, Defendants evaluate numerous risk-related credit variables, including debt-to-income ratios, loan-to-value ratios, credit bureau histories, debt ratios, bankruptcies, automobile repossessions, prior foreclosures, payment histories, credit scores, and the like.

99.   Defendants derive a risk-based financing rate from these objective factors, which Defendants and others in the mortgage industry simply call the "par rate." (Defendants' brokers and correspondent lenders can also estimate the par rates by referring to an applicant's credit bureau-determined credit score.)

100.   Although Defendants' initial analysis applies objective criteria to calculate this risk-related interest rate, Defendants, as a matter of policy and procedure, authorize their loan officers, brokers and correspondent lenders to mark up that rate later, and also impose additional non-risk-based charges including yield spread premiums, and other discretionary fees. Defendants regularly communicate applicable par rates, authorized yield spread premiums, and other discretionary fees to their loan officers, brokers and correspondent lenders via "rate sheets" and other communications.

101.   Defendants' policy is to give their loan officers, authorized mortgage brokers and correspondent lenders discretion to impose subjective fees on borrowers.   When borrowers pay such subjective fees, Defendants share in additional income generated—whether from increased fees at closing, increased interest rates affected by unnecessarily high terms set by retail loan

officers and/or increased rates affected by the payment of yield spread premiums to outside brokers.[19]

102.    Defendants' policies and procedures concerning the assessment of subjective, discretionary fees cause persons with identical or similar credit scores to pay differing amounts for obtaining credit.  Such subjective loan pricing -- which by design imposes differing finance charges on persons with the same or similar credit profiles -- disparately impacts Defendants' Minority borrowers.

103.    While Defendants' use of a common credit policy for all loan applicants might appear to be racially neutral, Defendants' use of subjective, discretionary fees disproportionately and adversely affects Minorities (relative to similarly situated non-minorities).  Defendants' credit policy causes Minorities to pay disparately more discretionary finance charges than similarly situated non-minorities.  As the HMDA data cited herein indicates, Minorities are substantially more likely than similarly situated non-Minorities to pay such charges when obtaining mortgage loans from National City.

104.    Defendants' credit policy is in fact intentionally discriminatory.  As described above, Defendants' credit pricing policy by design discriminates against Minority borrowers and directly causes this disparate impact.

105.    While long suspected, this discrimination has only recently been disclosed and quantified.  It has only been in the last few years that mortgage lenders have been required to submit details of their sub-prime home loans under the Home Mortgage Disclosure Act.  The groups that have studied predatory lending and the mortgage market have uncovered incredible racial disparities in the types of mortgages offered.

---

[19] *See* "Testimony of Keith Ernst, Senior Policy Counsel, Presented to the Subcommittee on Financial Institutions and Consumer Credit." June 13, 2006. Available: http://www.responsiblelending.org/

106.    By placing Minority mortgagors into higher-priced sub-prime loans because of their race, Defendants violate the Fair Housing Act, the Equal Credit Opportunity Act, and the Civil Rights Act.  These violations entitle Plaintiffs and the Class Members to the declaratory and injunctive relief provided under the Acts.

## COUNT I:
### VIOLATIONS OF THE FAIR HOUSING ACT
### (42 U.S.C. §3601 et seq.)

107.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

108.    Plaintiffs and the putative class members are members of a protected class under the Fair Housing Act.

109.    Plaintiffs were qualified to receive a loan with more favorable credit terms and associated costs.  Yet Defendants issued them a loan with terms less favorable and with higher associated costs, despite their qualifications, while Defendants offered loans with more favorable terms and lower associated costs to non-Minorities with the same or similar qualifications as Plaintiffs.

110.    The Fair Housing Act was enacted in 1968 to prohibit discrimination in connection with real estate transactions such as purchasing and refinancing a home.  The Fair Housing Act has been broadly construed by the courts to protect consumers.

111.    The Fair Housing Act prohibits mortgage lenders from imposing different terms or conditions on a loan on the basis of race.  Defendants targeted Minorities for higher cost sub-prime mortgage loans, while directing similarly-qualified Caucasian applicants into lower cost loans.

112.   Defendants engaged in residential real estate-related transactions with respect to the Plaintiffs and all prospective Class Members.

113.   Defendants' discretionary pricing policies have resulted in discrimination with respect to the Plaintiffs and all prospective members of the Class.

114.   As a result of Defendants' discretionary pricing policies, Defendants have collected more in finance charges from Minorities than from similarly-situated Caucasian persons, for reasons unrelated to credit risk.

115.   Defendants' discretionary pricing policies violate the Fair Housing Act and constitute actionable discrimination on the basis of race.

116.   Plaintiffs and the Class Members are aggrieved persons as defined in the Fair Housing Act by virtue of having been subjected to Defendants' discriminatory discretionary pricing policies.

**COUNT II:**
**VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT**
**(15 U.S.C. §1691 et seq.)**

117.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

118.   The Equal Credit Opportunity Act was first enacted in 1974 as a consumer protection statute prohibiting discrimination in the issuing of credit. The Equal Credit Opportunity Act has been broadly construed by the courts in order to protect consumers.

119.   Plaintiffs were "applicants," as defined in the Equal Credit Opportunity Act.

120.   Defendants are "creditors" as defined in the Equal Credit Opportunity Act and in the ordinary course of their business, participated in the decision of whether or not to extend credit to Plaintiffs and all prospective members of the Class.

121.   Plaintiffs and Defendants engaged in a "credit transaction," as defined by the Equal Credit Opportunity Act.

122.   Defendants designed, disseminated, controlled, implemented and profited from the discriminatory policies and practices alleged herein, which have had a disparate economic impact on Minorities as compared to similarly situated Caucasians.

123.   All actions taken by Defendants' employees and brokers were in accordance with the specific authority granted to them by Defendants and were in furtherance of Defendants' policies and practices.

124.   As a result of Defendants' discretionary pricing policies, Defendants have collected more in finance charges and other fees from Minorities than from similarly situated Caucasian persons, for reasons totally unrelated to credit risk.

125.   Defendants' discretionary pricing policies are discriminatory and violate the Equal Credit Opportunity Act.

126.   Plaintiffs and prospective members of the Class are aggrieved persons, as defined in the Equal Credit Opportunity Act, by virtue of having been subjected to the discriminatory pricing policies of National City.

**COUNT III:**
**VIOLATIONS OF THE CIVIL RIGHTS ACT: RACIAL DISCRIMINATION**
**(42 U.S.C. §§ 1981, 1982 et seq.)**

127.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

128.   The Civil Rights Act of 1866 and 1870, and later expanded in 1991, prohibits racial discrimination in the formation and issuance of contracts, and intentional interference to purchase and hold real property.

129.    Defendants intentionally discriminated against Plaintiffs and the Class Members by charging them higher interest rates than those charged to similarly-situated Caucasian mortgagees.

130.    By charging higher rates to Plaintiffs and Class Members, Defendants unlawfully discriminated against them in the (i) formation of contracts, (ii) making, performance, modification, and termination of contracts, and/or (iii) the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship, and in their right to purchase and hold real property.

131.    Defendants' actions violate the Civil Rights Act. As a proximate result of Defendants' systematic violation of this statute, Plaintiff and the Class Members are entitled to the requested relief provided thereunder.

## COUNT IV:
## UNJUST ENRICHMENT

132.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

133.    To the detriment of Plaintiffs and Class members, National City has been, and continues to be unjustly enriched as a result of its discriminatory conduct.

134.    Upon information and belief, National City's unfair, discriminatory operation of mortgage lending enabled it to unjustly collect millions of dollars from Plaintiff and the Class.

135.    Accordingly, Plaintiffs and the Class seek full restitution and disgorgement of all such amounts, as well as other equitable relief as the Court may deem proper to remedy Defendants' unjust enrichment, including, without limitation, the establishment of a constructive trust from which Plaintiffs and the Class may seek restitution.

## PRAYER

WHEREFORE, Plaintiffs pray for entry of judgment as follows:

A.      Certify this case as a class action and certify the named Plaintiffs herein to be adequate Class representatives and their counsel to be Class counsel;

B.      Enter a judgment, pursuant to 15 U.S.C. 1691e(c) and/or 42 U.S.C. § 3613, declaring the acts and practices of Defendants, complained of herein to be in violation of the Equal Credit Opportunity Act, the Fair Housing Act and the Civil Rights Act;

C.      Grant a permanent or final injunction, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), enjoining Defendants, and Defendants' agents, employees, affiliates and subsidiaries from continuing to discriminate against Plaintiffs and the members of the Class because of their race through further use of any discretionary pricing policies or any non-risk-related discretionary pricing policy employed by Defendants;

D.      Order Defendants, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. § 3613(c), to adopt and enforce a policy that requires appropriate training of Defendants' employees, mortgage specialists and network of mortgage brokers to prevent discrimination;

E.      Order Defendants, pursuant to. 15 U.S.C. §1691e(c) and/or 42 U.S.C. § 3613(c), to monitor and/or audit the racial pattern of its financings to ensure the cessation of discriminatory effects in its home mortgage transactions;

F.      Order disgorgement, pursuant to 15 U.S.C. §1691e (c), of all disproportionate non-risk charges imposed on Minorities by Defendants' discretionary pricing policies; and order the equitable distribution of such charges, as restitutionary relief, to all appropriate Class Members;

G.      Order actual and punitive damages to Plaintiffs and the Class pursuant to 42 U.S.C. §3613(c);

H.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees, pursuant to 15 U.S.C. §1691e(d) and/or 42 U.S.C. §3613(c);

I.      Order the establishment of a constructive trust from which Plaintiffs and the Class may seek restitution; and

J.      Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 1, 2008                          Respectfully submitted,

                                            **SCHIFFRIN BARROWAY TOPAZ &
                                            KESSLER, LLP**


                                            By: _____*JHM6596*_____
                                                   Joseph H. Meltzer
                                                   Edward W. Ciolko
                                                   Joseph A. Weeden
                                                   280 King of Prussia Road
                                                   Radnor, PA 19087
                                                   Telephone: (610) 667-7706
                                                   Facsimile: (610) 667-7056

                                                   ***Attorneys for Plaintiffs***